# EXHIBIT A

**AMERICAN ARBITRATION ASSOCIATION**
**COMMERCIAL ARBITRATION**

PANINI AMERICA, INC.,

     *Claimant-Counterclaim Respondent,*

     v.

NATIONAL FOOTBALL LEAGUE PLAYERS
INCORPORATED,

     *Respondent-Counterclaimant.*

AAA Case No. 01-23-0003-7163

## FINAL DECISION AND AWARD

Panini America, Inc., brought a demand for arbitration against National Football League Players Incorporated, alleging breach of contract. After a three-day merits hearing and substantial briefing, we conclude that NFLPI's purported termination of its license agreement with Panini was invalid and therefore constituted a breach, and we award Panini such damages as we have found to have resulted.

**Counsel:**

David Boies
Eric J. Brenner
Boies Schiller Flexner LLP
New York, NY

Stuart H. Singer
Sabria A. McElroy
Jason Hilborn
Boies Schiller Flexner LLP
Fort Lauderdale, FL

James P. Denvir
Richard A. Feinstein
Boies Schiller Flexner LLP
Washington, D.C.

Sean Phillips Rodriguez
Boies Schiller Flexner LLP
San Francisco, CA

Ursula Ungaro
Boies Schiller Flexner LLP
Miami, FL
*Counsel for Claimant-Counterclaim Respondent Panini America, Inc.*

Jeffrey L. Kessler
David L. Greenspan
Adam I. Dale
Winston & Strawn LLP
New York, NY

Diana H. Leiden
Winston & Strawn LLP
Los Angeles, CA

Eric B. Bruce
Justin C. Simeone
Freshfields Bruckhaus Deringer US LLP
Washington, D.C.
*Counsel for Respondent-Counterclaimant National Football League Players Incorporated*

**Arbitral Panel:**

Michael B. Mukasey, Chair
Debevoise & Plimpton LLP
New York, NY

Jeffrey A. Mishkin, Arbitrator
Phillips ADR Enterprises
New York, NY

Kenneth R. Feinberg, Arbitrator
The Law Offices of Kenneth R. Feinberg PC
Washington, D.C.

**Place of Arbitration:** New York, New York

**Date of Hearing:** May 6–8, 2024

**Date of Final Decision and Award:** July 30, 2024

## I.    Introduction

The dispute resolved by this Final Decision and Award stems from the entry into the trading-card market of a group of entities collectively known as Fanatics;[1] Fanatics's effort to inflict competitive injury on an established trading-card company, Panini America, Inc. ("Panini"); and the subsequent attempts by National Football League Players Incorporated ("NFLPI") to mitigate the fallout.

In March 2021, Fanatics ████████████████████████████████████ in exchange for entering into an agreement to license the right to produce trading cards featuring NFLPI's members.  The agreement would spring into effect in 2026 or upon termination of NFLPI's existing license agreement with Panini.  Fanatics first attempted to poach Panini's CEO and, afterwards, to buy Panini; failing on both fronts, it took aggressive steps to reduce Panini's competitiveness, including hiring several Panini employees in April 2023.  These actions appeared to threaten NFLPI's trading-card license revenues.  In August 2023, NFLPI purported to terminate its license agreement with Panini, principally on the ground that Panini had suffered a material change to its executive management through the loss of certain employees to Fanatics.

The underlying dispute involves three entities—Fanatics, Panini, and NFLPI—only two of which are parties to this arbitration.  We are not charged with resolving all legal controversies among them, many of which are currently pending before various federal and state courts, and we

---

[1] "Fanatics" includes "Fanatics, Inc.; Fanatics, LLC; Fanatics Collectibles TopCo., Inc.; Fanatics Intermediate HoldCo., Inc.[;] Fanatics, SPV, LLC; and Fanatics Holdings, Inc."  Am. Demand ¶ 24.

do not address or purport to resolve any of the issues involved in those cases. We address and resolve only the narrow question of whether the license agreement between Panini and NFLPI, as interpreted consistent with New York law, granted NFLPI the right to terminate it in August 2023. We hold that it did not, and we award Panini damages of $7,816,946.97 and declare, order, and adjudge that the license agreement remains fully in effect.

## II.    Factual Background

### A.    The Parties

Panini, the U.S. subsidiary of Italian trading-card company Panini S.p.A., was founded in 2009. Am. Demand ¶¶ 7, 13. Shortly after its entry into the market, Panini obtained the rights to distribute trading cards depicting professional athletes through license agreements with players' associations. *Id.* ¶¶ 20–21. NFLPI is the for-profit licensing arm of the National Football League Players Association ("NFLPA"), the labor union for National Football League ("NFL") players. Hr'g Tr. 650:25–651:15 (Howell). Most NFL players assign to the NFLPA and NFLPI the right to use their names, autographs, photographs, and jersey numbers in NFLPI's licensing programs. In turn, the NFLPI licenses the players' rights for use in trading cards and video games, and splits the revenue among the NFL players. Am. Counterclaims ¶ 11.

### B.    The License Agreement

On March 28, 2016, Panini and NFLPI entered into a license agreement (the "License Agreement"). Am. Demand ¶ 22; Am. Counterclaims ¶ 15. Under its terms, NFLPI granted Panini, *inter alia*, "███████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████." License Agreement § 2(A). In return, Panini agreed

4

" ████████████████████████████ " as well as " ██████████████████ " on Panini's " ██

██ ." *Id.* §§ 6(A), (C).  The License Agreement " ██████████████████████████████

██████████████████████████████ ."  *Id.* § 5(A).  It requires

Panini to obtain approval from NFLPI to market its trading cards.  Panini " ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ ."

*Id.* § 15(B).

The License Agreement reserves to NFLPI the right to terminate for various reasons.  For

one, the parties agreed that if Panini



*Id.* § 20(C).  Further, a clause entitled " ██████████████████ " provides that the rights granted

to Panini

*Id.* § 31.

5

The parties agreed that the License Agreement " ███████████████

███████████████████████████," *id.* § 32(A), and to arbitrate all

disputes though the American Arbitration Association ("AAA"), *id.* § 32(B). ████████

███████████████████████████████████

███████████████████████████." *Id.* § 24.

### C.    Fanatics's Entry into the Trading Card Market

On March 26, 2021, NFLPI and Fanatics entered into an agreement whereby Fanatics

would license NFL players' publicity rights to produce and market trading cards, precipitating the

chain of events that led to this arbitration. *See* Joint Ex. 5 at NFLPI_0002178. This new license

was to take effect " ███████████████████████

███████████████████████████████████

████████████████████████████ . . . ." *Id.*

at NFLPI_0002207. Under the Fanatics agreement, NFLPI ████████████

███████████████████████████████████

████████████████. *See id.* at NFLPI_0002190–91; February 29, 2024 NFLPI

Letter to Panel Regarding Redactions at 3. As of January 2024, ████████████

███████████████████████████████████

████. Joint Ex. 52 at NFLPI_0001781. In August 2021, Panini learned of the NFLPI-Fanatics

license agreement. Hr'g Tr. 181:11–20, 271:6–12 (Warsop); NFLPI Ex. 51. ████████

███████████████████████████████████

███████████████████████████████████

██████████████ Hr'g Tr. 181:24–182:23 (Warsop).

In late 2021 or January 2022, Fanatics purchased a competing trading-card manufacturer, The Topps Company, Inc. ("Topps"). *Id.* at 188:8–10; NFLPI Post-Hearing Br. at 21 & n.11. Soon thereafter, in January 2022, Fanatics sought to hire Panini's CEO, Mark Warsop, to run Topps. Hr'g Tr. 188:11–16 (Warsop). The CEO of Panini, S.p.A., Aldo Sallustro, convinced Warsop to stay at Panini by offering him a $███████ signing bonus, a percentage of Panini's profits, and an increase of his base salary to $███████. *Id.* at 296:4–297:2; NFLPI Ex. 60 at PAN-NFLPI_00007506. Also in late 2021, Fanatics's CEO, Michael Rubin, reached out to Sallustro to discuss a potential merger between Fanatics and Panini, talks that began and then resumed after a brief hiatus in February 2022. Hr'g Tr. at 462:21–463:8 (Sallustro). When Panini requested that Fanatics sign a standard agreement in connection with the negotiations not to solicit employees during the negotiations and if they broke down, Fanatics declined, calling the request a "deal-breaker." *Id.* at 507:19–509:18. The merger discussions continued for approximately a year, *id.* at 510:19–511:21, but ultimately ended in February 2023, *id.* at 467:14–16.

Fanatics then took a series of steps apparently designed to hurt Panini's business. On April 3, 2023, Nick Matijevich, Panini's Vice President of Product Development, informed Panini that he was leaving to take a job with Fanatics. Panini Ex. 58. In response, ███████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████. Hr'g Tr. 202:12–203:25, 207:8–12 (Warsop); *id.* at 390:11–391:9 (Aravecchia); Panini Ex. 10. Brian Bayne, Panini's Vice President of Acquisitions, declined the offer, and on April 4 he, too, informed Panini of his departure to take a position at Fanatics. Hr'g Tr. 394:13–21 (Sallustro). Several other Panini employees also resigned to move to Fanatics, including Elizabeth Galaviz, Acquisitions

7

Director for Football; Carlos Torrez, Senior Production Director; and Alexander Carbajal, Acquisitions Director for Soccer. *Id.* at 216:25–219:20 (Warsop); Hull Dep. Tr. 70:4–16, 181:3–20.

In early 2022, Fanatics acquired a controlling interest in GC Packaging, LLC ("GCP"), which had previously served as Panini's printing vendor. Hr'g Tr. 324:18–21 (Warsop); NFLPI Ex. 3 ¶ 77; Joint Ex. 52 at NFLPI_0001776. Fanatics also signed exclusive contracts to license the publicity rights of some of the NFL's most promising rookie quarterbacks. Hr'g Tr. 227:20–228:9 (Warsop); Joint Ex. 52 at NFLPI_0001776. The latter action was not only designed to hurt Panini, but Fanatics's future partner NFLPI viewed it as harmful to NFLPI's own interests. *See, e.g.,* Joint Ex. 17 (██████████████████████████████████ "██████████████████████████████████████████ ██████████████").

Panini responded to these actions by filing a lawsuit against Fanatics and seven of Panini's departed employees on April 14, 2023, alleging breach of contract and misappropriation of trade secrets, and another against Fanatics on August 3, 2023, alleging antitrust violations. Hr'g Tr. 316:12–22 (Warsop); NFLPI Exs. 2, 3. Fanatics sued Panini on August 7, 2023, alleging unfair competition and tortious interference with commercial relations. NFLPI Ex. 50.

### D.    NFLPI Purports to Terminate the License Agreement

In June 2023, NFLPA's executive committee selected Lloyd Howell to be the new Executive Director of the NFLPA and Chairman of the NFLPI. Hr'g Tr. 650:3–6, 655:5–14 (Howell). NFLPI employees gave Howell briefing materials to introduce him to the job, including a summary of NFLPI's license agreements that informed Howell of recent developments concerning the competition between Panini and Fanatics. *Id.* at 660:5–25; Joint Ex. 52 at

8

NFLPI_0001775–76, NFLPI_0001784–85.  Howell and other NFLPI executives met with Panini employees at Panini's offices on August 7.  Hr'g Tr. 718:4–8 (Howell); *see* Joint Ex. 46.  Although the August 7 meeting appeared productive to Panini, *see* Hr'g Tr. 239:13–240:4 (Warsop), Steve Scebelo, NFLPI's President, sent a letter (the "Notice of Termination") to Warsop on August 21, 2023, alleging that"[t]he material departures of Panini's executive management team trigger NFLPI's contractual right to terminate the License Agreement, effective immediately, in accordance with Section 31 of the Agreement," Notice of Termination at 1.[2]

## III.    Procedural History

### A.    Pleadings and Emergency Arbitration

On August 22, 2023, Panini filed a demand for commercial arbitration against NFLPI with the AAA pursuant to § 32(B) of the License Agreement.  Panini denied NFLPI's rationales for termination and argued that they "are mere pretext to free NFLPI to contract with . . . Fanatics." Demand ¶ 48.  Panini argued that it "did not suffer 'a material change in executive management or control'" because Fanatics had only hired "two of [Panini's] nine executive team member[s]," and those who left were "quickly replaced." *Id.* ¶¶ 3, 56, 59.  Panini sought damages and injunctive relief.  *Id.* ¶¶ 77–104.

NFLPI responded that § 31 of the License Agreement "gave NFLPI the absolute prerogative to terminate the agreement immediately."  Counterclaims ¶ 5.  And it argued that the change in Panini's executive management was material because "at least seven of Panini's executive management personnel . . . resigned from Panini."  *Id.* ¶ 6.  Additionally, NFLPI now claimed that Panini "obtained autographs from first-year NFL players ▮▮▮▮▮▮ and ▮▮

---

[2]  Scebelo also maintained that "NFLPI has reason to believe that several more breaches—in violation of additional Agreement provisions—ha[d] occurred," and reserved its rights to terminate under those provisions as well.  Notice of Termination at 3.

███  based on rights allegedly granted through *collegiate* agreements, and then used those autographs for *NFL* trading cards . . . despite NFLPI expressly objecting . . . and Panini's failure to submit accurate renderings of the signed cards to NFLPI for review and approval." *Id.* ¶ 57 (emphases in original). NFLPI alleged breach of contract and infringement of NFLPI's intellectual property. *Id.* ¶¶ 80–112.

NFLPI applied for emergency relief to prevent Panini's continued use of its intellectual property despite the putative termination. *See id.* ¶ 9. September 29, 2023, the emergency arbitrator, J. Brian Casey, denied NFLPI's application for emergency relief. Order for Emergency Relief ¶ 67. The parties proceeded to arbitration on the merits.

### B.    The Panel's January 12 Order and Amended Pleadings

The first preliminary hearing before the Panel was held via telephonic conference on December 19, 2023. On January 12, 2024, the Panel issued an opinion and order (the "January 12 Order") interpreting the word "suffer" in § 31 of the License Agreement. Having "read the word in the context of the surrounding language and the Agreement as a whole," the Panel majority concluded that, "in this instance, 'suffer' unambiguously means 'allow or permit,'" and "[t]he relevant clause of § 31, therefore, enables NFLPI to terminate the Agreement only if Panini implements, allows, or permits a material change in its executive management or control, not merely if Panini endures or experiences such a change." January 12 Order at 5. The Panel permitted NFLPI and Panini to amend their pleadings in response. *Id.* at 11.

In response, the parties amended their pleadings. Most relevantly, NFLPI's Amended Counterclaims "set[] forth additional allegations to address the [Panel] majority's conclusion" in the January 12 Order. Am. Counterclaims ¶ 37 n.4. NFLPI argued that Panini's employees were at-will and not signed to fixed-term contracts, and that Panini did not enter into "post-employment

10

restrictive covenants," with the consequence that Panini, in effect, "passively permitted, allowed, and/or tolerated their departures." *Id.* ¶¶ 38–46.

### C.    The Subpoena to Fanatics and Further Hearings

On January 25, 2024, Panini moved the Panel for "the right to obtain discovery of Fanatics." January 25, 2024 Panini Letter to Panel at 2. We permitted Panini to serve a third-party subpoena on Fanatics to attend a preliminary hearing and produce documents. February 13, 2024 Order at 2. The second preliminary hearing was held at the offices of Debevoise & Plimpton LLP in New York, New York, on April 17, 2024. David Leiner, President of Trading Cards at Fanatics Collectibles, testified as Fanatics's corporate representative. Prelim. Hr'g Tr. 9:8–12, 12:22–13:7.

Panini requests damages of approximately $48.3 million, while NFLPI requests damages of over $171 million and injunctive relief. Panini Pre-Hearing Br. at 40; NFLPI Pre-Hearing Br. at 50–51 & n.41. The merits hearing was held at the offices of Debevoise & Plimpton LLP in New York, New York, on May 6, 7, and 8, 2024. The parties submitted two rounds of post-hearing briefs.

## IV.    Analysis

### A.    Panini Did Not Suffer a Material Change in Its Executive Management

Panini argues that NFLPI's putative termination of the License Agreement under § 31 was invalid because Panini did not "suffer" a change in executive management, and because the change in executive management was not material. Am. Demand ¶¶ 59–66; Panini Post-Hearing Br. at 2, 13; Panini Post-Hearing Reply Br. at 1, 5. We find for Panini on both points.[3]

---

[3] Panini additionally argues that NFLPI's putative termination was invalid as violative of NFLPI's implied covenant of good faith and fair dealing and because NFLPI failed to provide notice and an opportunity to cure. Panini Post-Hearing Br. at 20, 26; Panini Post-Hearing Reply Br. at 9, 12. Because we hold the termination invalid on other grounds, we need not and do not reach these arguments in this context.

1.      **Panini Did Not "Suffer" a Change to Its Executive Management**

(a)     **Sufferance Requires Knowledge and Intention, but Can Be Achieved Without an Affirmative Act**

The Panel majority previously concluded that, under New York law and in the context of § 31 of the License Agreement, "'suffer' unambiguously means 'allow or permit.'" January 12 Order at 5. But the January 12 Order did not purport to determine what conduct, in these circumstances or in general, is necessary to constitute the sufferance, permission, or allowance of an event. We turn to that question now.

The parties have agreed that controlling New York law on the definition of "suffer"—in the sense of "allow or permit"—requires a particular mental state that includes both knowledge and intention. Panini Pre-Hearing Br. at 15–16; NFLPI Pre-Hearing Br. at 15; Panini Post-Hearing Br. at 2; Panini Post-Hearing Reply Br. at 1 & nn.1–2. This is for good reason: The caselaw, in New York and elsewhere, explains that for someone to have suffered, allowed, or permitted an event, that person must have both known the event would happen and intended it to happen. *See, e.g.*, *First Nat'l Bank & Tr. Co. of Port Chester v. New York Title Ins. Co.*, 12 N.Y.S.2d 703, 709 (Sup. Ct. 1939) ("It has been said that every definition of 'suffer' and 'permit' includes knowledge of what is to be done under the sufferance and permission, and intention that what is done is to be done."); *Houlihan v. Selengut*, 25 N.Y.S.2d 371, 375 (Sup. Ct.) (same), *rev'd on other grounds*, 31 N.Y.S.2d 560 (App. Div. 1st Dep't 1941); *Atwater v. Lober*, 233 N.Y.S. 309, 313 (Cnty. Ct. 1929) (same); *see also, e.g.*, *Lawyers Title Ins. Corp. v. Doubletree Partners*, 739 F.3d 848, 867 (5th Cir. 2014); *United States v. Launder*, 743 F.2d 686, 689 (9th Cir. 1984); *Gregory v. United States*, 10 F. Cas. 1195, 1198 (C.C.S.D.N.Y. 1879); *see generally Cowley v. People*, 83 N.Y. 464, 471 (1881) (using the word "sufferance" synonymously with "authorization").

12

Despite its initial agreement that sufferance requires an "intention that what is done is to be done," NFLPI Pre-Hearing Br. at 15 (quoting *First Nat'l Bank*, 12 N.Y.S.2d at 709), NFLPI now changes course.  It points to the Panel's holding that a person can "suffer" an event if that person "passively allows" it to happen.  NFLPI Post-Hearing Br. at 15 (quoting January 12 Order at 7); *see* NFLPI Post-Hearing Reply Br. at 3–4.  However, NFLPI is mistaken when it argues that an interpretation of sufferance as requiring intent "turns [the January 12 Order] on its head." NFLPI Post-Hearing Br. at 15.  As discussed, sufferance requires a particular mental state: knowledge and intention.  Although that mental state may be described as volitional, that does not mean sufferance also requires an affirmative act.  New York cases explain that sufferance is accomplished by omission.  *See, e.g.*, *People v. Harrison*, 170 N.Y.S. 876, 878 (App. Div. 2d Dep't 1918) ("The word 'permit' . . . is synonymous with 'suffer' or 'allow'—not to prohibit or to prevent—an act of omission."); *Robertson v. Ongley Elec. Co.*, 31 N.Y.S. 605, 608 (Gen. Term 1st Dep't 1894) ("[T]he doing of certain things may be permitted or suffered without an affirmative act, but that [permission or sufferance] cannot be done without an omission to do some act which might have prevented it."), *aff'd*, 146 N.Y. 20 (1895).  There is nothing inconsistent about holding that sufferance requires intent and also holding that sufferance involves passive inaction or omission.

NFLPI also suggests that this reading contradicts other language in the January 12 Order, which explained that "the word 'implements' must do 'independent work' from 'suffers' in Section 31" of the License Agreement.  NFLPI Post-Hearing Reply at 4 (quoting January 12 Order at 7). NFLPI submits that the definition of "suffers" as "intended" "is practically indistinguishable from 'implements.'"  *Id.*  Again, NFLPI misunderstands the distinction between mental state and action. While the implementation of something clearly requires intent, it also requires an act of volition;

13

one would not say someone "implemented" a change if that person merely declined to stand in the way of that change's enactment. In *People v. Harrison*, the Appellate Division of the New York Supreme Court made this exact distinction, explaining that to "cause" and to "permit" differ because "cause" "should be interpreted as descriptive of some affirmative act—an act of commission," while "permit" is "synonymous with 'suffer'" and indicates "an act of omission." 170 N.Y.S. at 878. The January 12 Order recognized the same. *See* January 12 Order at 7 (explaining that Panini can either "suffer" changes by "passively allow[ing]" them, or it can "implement those changes itself").

NFLPI's opposing cases are inapposite. It identifies two cases that suggest that sufferance does not require intent. *See* NFLPI Pre-Hearing Br. at 15 (citing *In re Rome Planing Mill*, 96 F. 812, 815 (N.D.N.Y. 1899), and *In re Thomas*, 103 F. 272, 274 (W.D. Penn. 1900)); NFLPI Post-Hearing Br. at 16 (same). Panini responds that those cases' interpretation of the word "suffer" should be limited to the context of the Bankruptcy Act of 1898. Panini Post-Hearing Br. at 2–3; Hr'g Tr. 19:23–20:22 (Boies). Panini is correct: In both cases the court's reasoning turned on the interpretation of a clause the Bankruptcy Act of 1898, in contradistinction with other clauses of the same act and with the previous federal bankruptcy statute. And even if NFLPI's reading of these cases is correct, the parties chose to follow New York law, *see* License Agreement § 32(A), not federal bankruptcy law, and, as discussed, the overwhelming weight of New York law holds that intention is an element of sufferance, *see, e.g.*, *First Nat'l Bank*, 12 N.Y.S.2d at 709; *Houlihan*, 25 N.Y.S.2d at 375; *Atwater*, 233 N.Y.S. at 313.

14

**(b)    Panini Did Not Intend Any Change to Its Executive Management**

The evidence is undisputed that Panini did not intend that there be a change in the composition of its executive management through Fanatics's hiring of some of Panini's personnel. Therefore, Panini did not "suffer" any change to its executive management.

NFLPI's argument that Panini was passive in the face of the threat from Fanatics is incorrect. Panini made decisions that it reasonably believed were sufficient to retain its senior employees. To be sure, Panini's retention policies were not completely adequate to avoid losing some employees to Fanatics. But nothing in Panini's behavior suggests knowledge of the loss of, or intention to lose, any of its employees to Fanatics.

Important context is that in early 2021—well before the public announcement of Fanatics's contract with NFLPI—Panini substantially increased its senior employees' compensation. Warsop explained that the raises roughly included "between 25 and 50 percent increase on base salary." Hr'g Tr. 176:3–11. Panini also "made a massive difference to the bonus structure." *Id.* at 176:14–15. Giorgio Aravecchia, CFO of Panini S.p.A. and a member of Panini's board of directors, explained that due to Panini's growth and high profitability, Panini leadership sought "to introduce a more rewarding compensation package where the bonus scheme was a bigger part of this compensation package." *Id.* at 369:21–370:10, 374:6–17. Panini's undisputed records confirm Warsop and Aravecchia's testimony: In 2020, Bayne received a salary of $██████ and a bonus of $█████; in 2021, he received a salary of $██████ (████████████) and a bonus of $██████ (a 313% increase). Panini Ex. 203. Matijevich, Torrez, Galaviz, and Carbajal experienced similar increases in compensation. *Id.*

At each point that NFLPI identifies, Panini took steps intended to retain its executive employees, and/or had reason to believe it could retain them.

15

*First*, at the time of what NFLPI calls the "triggering event," when it became public in August 2021 that "Fanatics acquired the license rights starting in 2026," Hr'g Tr. 102:12–15 (Kessler), Panini enacted " ███████████████████████████████████████████████████████████████████████████████████████ ," *id.* at 182:5–10 (Warsop).

Panini's decision not to impose a non-compete clause ("non-compete") in connection with the August 2021 retention program was a rational exercise of its executives' business judgment. The record shows that Panini did seriously consider implementing non-competes. Panini considered two ideas Aravecchia and Warsop thought "might increase the chance of retaining key personnel at Panini America in the coming months": a non-compete agreement and a retention bonus. NFLPI Ex. 4 at PAN-NFLPI_00028947. ███████████████████████████████ ███████████████████████████████████████, NFLPI Pre-Hearing Br. at 17 (citing NFLPI Ex. 53 at PAN-NFLPI_00028949), ████████████████████ ███████████████████████████████████████████████ ███████████████████████████, NFLPI Ex. 4 at PAN-NFLPI_00028947. ████████ ████████████████████████████. Hr'g Tr. 185:11–18 (Warsop). Though NFLPI tells us that Panini failed to institute the "low-cost, high-impact measure" of non-competes, NFLPI Pre-Hearing Br. at 18, the fact that retention bonuses were more expensive than non-competes makes it understandable for Panini to have thought it was enacting the more retentive of the two measures.

*Second*, Panini responded to Fanatics's attempt to hire Warsop by offering him a substantial increase in compensation. Panini's leadership thought Fanatics would not try to poach employees other than Warsop because it had recently acquired all of Topps's employees. *See* Hr'g Tr. 189:25–190:16 (Warsop). Panini's success in giving Warsop a counteroffer provided some

16

evidence that, if Fanatics attempted to poach other Panini executives, Panini could successfully counter after the fact. Panini's decision not to implement further retention measures in February 2022 did not constitute sufferance of its employees' departures in April 2023.

*Third*, in March 2022, early in the negotiations between Panini and Fanatics, Panini asked Fanatics to sign an agreement not to solicit its employees in case merger talks broke down; Fanatics refused, calling it a "deal-breaker." Sallustro Dep. Tr. 68:7–15; Hr'g Tr. 421:10–15 (Aravecchia); *id.* at 508:20–509:22 (Sallustro). Panini continued the negotiations nonetheless. Aravecchia testified that "Fanatics just bought Topps," so he believed "the exposure to the risk [of solicitation] was minimal." Hr'g Tr. 422:2–6, 423:12–15.

*Fourth*, once Matijevich announced his departure on April 3, 2023—*i.e.*, once Panini had actual knowledge of Fanatics's intent to hire its employees—Panini swiftly took action. It implemented a robust retention plan, promising an additional bonus in 2026 and paying an enormous advance in exchange for signing a non-compete. For example, Bayne, whose 2023 base salary was $⬛⬛⬛, was offered a bonus advance of $⬛⬛⬛ and an estimated total bonus payout of $⬛⬛⬛. Panini Ex. 203. Other Panini employees were offered similar amounts. Panini Ex. 208. That Panini asked its employees to sign non-competes in April 2023 does not undermine its reasoning in 2021 or 2022. By April 2023, Panini's "situation [wa]s very different." Hr'g Tr. 207:13–16 (Warsop). Unlike at those earlier points, Panini now actually knew of Fanatics's plan to poach large numbers of Panini's senior employees, and it took more aggressive action in line with this changing awareness.

In sum, Panini's response at each point does not indicate passivity or indifference, but rather an intent to retain its employees in the face of Fanatics's tactics. NFLPI's retention expert,

17

Josephine Gartrell, testified that Panini, rather than being indifferent, "made an effort to keep" its employees.  Hr'g Tr. 847:23–24.

NFLPI is therefore left with the argument that Panini was not passive, but rather not aggressive enough.  But NFLPI does not identify, and we cannot find, a New York case that holds that a party will be found to have suffered an event the party did not intend unless—with the benefit of hindsight—the party does everything humanly possible to prevent it.  Perhaps Panini could have implemented a more forceful retention program.  But New York law does not require every action that would, in retrospect, have prevented the harm.

We conclude that Panini did not "suffer" the loss of its employees as that word is used in § 31 of the License Agreement.

### 2.    The Changes to Panini's Executive Management Were Not Material

Alternatively, we also hold that the changes to Panini's executive management caused by departures to Fanatics in April 2023 were not "material."  Even if Panini suffered the loss of the employees at issue, § 31 of the License Agreement does not support termination by NFLPI.

#### (a)    Matijevich and Bayne Were the Only Members of Panini's "Executive Management" to Depart in April 2023

The parties dispute which former Panini employees constituted Panini's "executive management."  Panini concedes Matijevich and Bayne's inclusion.  *See* Panini Post-Hearing Br. at 9; Hr'g Tr. 212:24–213:6 (Warsop).  While NFLPI previously argued that additional Panini employees were members of executive management, it now limits its claim to Matijevich, Bayne, Torrez, Galaviz, and Carbajal.  *See* NFLPI Post-Hearing Br. at 28–30.  Since neither party negotiated any special meaning for "executive management" or required that certain people be included or excluded from the term, *id.* at 270:23–271:5, we must first determine whether the meaning of "executive management" in the context of the License Agreement includes Torrez,

18

Galaviz, or Carbajal.  We conclude that only Matijevich and Bayne were members of Panini's executive management in April 2023.

We are aware that both parties can retrospectively point to testimony that supports, to some degree, each of their claims about who constitutes executive management.  Therefore, we are most convinced by documents created before April 3, 2023, when Panini first anticipated litigation, and the undisputed testimony about Panini's pre-April 2023 behavior.  The weight of this evidence supports Panini's assertion that it had a 10-person executive management team made up of: (1) Warsop; (2) Bayne; (3) Robert Hull, Panini's CFO; (4) Jennifer Stepp, Vice President of Finance; (5) D.J. Kazmierczak, Senior Vice President of Operations; (6) Tom Baker, Vice President for Prepress & Editorial; (7) Kevin Haake, Vice President for Sales; (8) Matijevich; (9) Jason Howarth, Vice President for Marketing & Digital; and (10) Stephanie Carlson, Vice President for Production:

- In December 2022, Warsop sent Sallustro an organizational chart for 2023.  The first page of the chart indicated a nine-person executive team, which Warsop explained excluded Carlson because she had informed him of her planned (later postponed) retirement.  The chart includes the other nine members of Panini's executive management.  Hr'g Tr. 211:11–212:14; Joint Ex. 3 at PANINI014.

- On February 15, 2023, Warsop emailed all Panini employees and listed "organizational changes" among his executive team.  He included the same 10 people.  Panini Ex. 2 at PAN-NFLPI_00007789.

- On March 9, 2023, Hull emailed the rest of the 10-person team, writing, "I know we have the exec meeting today and this is going to be a topic, so I'll go ahead now and

19

give you an update, so we don't have to spend a lot of time on this."  Panini Ex. 3 at PAN-NFLPI_00019696.

- Warsop testified under oath, and NFLPI does not dispute, that these same 10 people attended Panini's executive team meetings.  Hr'g Tr. 212:19–23.

NFLPI's effort to sweep more employees under the umbrella of "executive management" fails because its definition of executive management includes ordinary managers and thereby makes a nullity of the word "executive" that precedes "management" in the License Agreement. *See* Hr'g Tr. 217:13–21 (Warsop: "32 people" would be included in the "executive management team if all the directors" on the level of Torrez, Galaviz, and Carbajal "were included").  Doubtless Torrez, Galaviz, and Carbajal, as director-level employees, were managers; they surely were "vested with a certain amount of discretion and independent judgment," and they managed other employees. *Management*, Black's Law Dictionary (11th ed. 2019);[4] *see* Joint Ex. 3 at PANINI015, PANINI020 (Galaviz managed six employees, Carbajal managed eight, and Torrez managed seven).  But to be part of executive management, an employee must have "active participation in the *control*, supervision, and management *of the business*."  *Executive Employee*, Black's Law Dictionary (11th ed. 2019) (emphases added).  A middle manager is a manager but does not participate in the control of the business as a whole, and therefore is not part of executive management.  We decline to read the word "executive" out of § 31.  *See Maxine Co. v. Brinks's Glob. Servs. USA, Inc.*, 94 A.D.3d 53, 56 (1st Dep't 2012) ("[A] contract must be construed to give effect to each and every part.").  Therefore, we conclude that Panini's executive management did not include Torrez, Galaviz, or Carbajal.

---

[4] "[I]t is common practice for the courts of this State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *Mazzola v. County of Suffolk*, 533 N.Y.S.2d 297, 297 (App. Div. 2d Dep't 1988).

**(b)       The Departures of Matijevich and Bayne Were Not Material**

Because only Matijevich and Bayne were members of Panini's executive management, we must determine whether their April 2023 departures were material.  They were not.

At the outset, the parties dispute the meaning of "material" in the context of § 31 of the License Agreement.  Panini argues that New York's standard for a material breach of a contract applies, Panini Post-Hearing Br. at 19 n.15; Panini Post-Hearing Reply Br. at 5–6, while NFLPI points us to federal securities law's standard for a material misrepresentation or omission, NFLPI Post-Hearing Br. at 30–31; NFLPI Post-Hearing Reply Br. at 8.  In fact, neither party is quite right.  We are not dealing with a misrepresentation or omission in the purchase or sale of a security, but neither are we dealing with a breach-of-contract provision; as NFLPI rightly points out, "Section 31 is not a breach provision" but instead grants NFLPI a voluntary "termination right."  NFLPI Post-Hearing Reply Br. at 2.  The question is what "material change," as a phrase, means.  Here, as in any context, materiality is a flexible and fact-dependent standard.  *See, e.g.*, *Material*, Black's Law Dictionary (11th ed. 2019) (defining "material" as "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential"); Restatement (Second) of Contracts § 241 cmt. a (1981) (materiality "is necessarily imprecise and flexible" and to be "applied in the light of the facts of each case in such a way as to further the purpose of securing for each party his expectation of an exchange of performances").

Applying that standard to these facts against the backdrop of the principles of New York contract law, we agree with Panini that the departure of Matijevich and Bayne was an immaterial change to Panini's executive management.  In New York, "[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties."  *In re Lipper Holdings, LLC*, 766 N.Y.S.2d 561, 562 (App. Div. 1st

21

Dep't 2003) (citations omitted); *see Elsky v. Hearst Corp.*, 648 N.Y.S.2d 592, 593 (App. Div. 1st Dep't 1996) (declining to adopt an "interpretation [that] would lead to what we perceive to be a commercially unreasonable restriction . . . [and] a result not contemplated by the parties upon execution of the agreement"); *833 N. Corp. v. Tashlik & Assocs., PC*, 683 N.Y.S.2d 111, 112 (App. Div. 2d Dep't 1998) (declining to adopt a reading that "would lead to an absurd result which would not accord with the reasonable expectations of the parties").

In the context of a 10-year agreement for exclusive rights, worth hundreds of millions of dollars, NFLPI's argument that it had sole discretion to terminate the License Agreement if there was any turnover in the personnel of executive management is commercially unreasonable and contrary to the reasonable expectations of the parties. Some turnover in the composition of executive management over that many years was nearly guaranteed. *See* Peter Cappelli, "Who Gets Promoted to the C-Suite—and How That Has Changed Over the Decades," *Wall Street Journal* (Dec. 14, 2023) ("Average tenure in executive roles is . . . close to four years.").[5] It would have been commercially unreasonable for NFLPI to demand, in essence, that Panini retain all or all but one of its executive management personnel for 10 years in their exact same positions— regardless of their age, medical condition, or job performance—in order to not grant NFLPI the right to terminate the License Agreement at will. Other members of Panini executive management, including Shelby Lee, Panini's CFO, had left prior to 2023 without any assertion by NFLPI that their departures triggered Panini's right to terminate. *See* Hr'g Tr. 209:25–210:23 (Warsop). Indeed, Matijevich and Bayne were not even in these positions at the time the License Agreement was entered into. *See id.* at 213:11–15, 214:24–215:2. Therefore, Matijevich and Bayne's future employment as Panini executives could not have been part of NFLPI's reasonable expectations

---

[5] https://www.wsj.com/business/promoted-executive-age-64b6e169 (accessed June 26, 2024).

22

when executing the License Agreement. It took NFLPI four and a half months after Matijevich and Bayne left to exercise its purported termination right—from April 4 until August 21, 2023—which further confirms that their departure was immaterial.

Additionally, Matijevich and Bayne's departure did not harm NFLPI, underscoring its immateriality. *Cf.* Restatement (Second) of Contracts § 241 cmt. b (1981) ("[A]n important circumstance in determining whether a failure is material is the extent to which the injured party will be deprived of the benefit which he reasonably expected from the exchange."). At the time of the purported termination, Matijevich and Bayne had already been replaced. *See* Hr'g Tr. 214:4–17, 215:10–216:9 (Warsop). And in May 2023, only a few weeks after the loss of Matijevich and Bayne, Panini's resilience was put to the test at the Rookie Premiere, "a[n] NFL Players event, primar[il]y to get assets for their licensed trading card company." *Id.* at 221:17–21. Yet it is undisputed that Panini's performance at the Rookie Premiere was a success. *See id.* at 226:6–227:6 (Warsop noting that Panini "collected more autographs in this particular event than we ever have in any Rookie Premiere event we had ever had prior"). ▮▮▮▮▮▮▮▮. *Id.* at 732:15–18 (▮▮▮▮▮▮▮▮▮▮▮▮" at the 2023 Rookie Premiere); ▮▮▮▮ Dep. Tr. 130:12–17 (▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮").

NFLPI makes much of an email from Aravecchia that referred to several Panini employees, including Matijevich and Bayne, as "indispensable."[6] NFLPI Post-Hearing Br. at 31 (quoting NFLPI Ex. 4 at PAN-NFLPI_00028947); NFLPI Post-Hearing Reply Br. at 8 (same). But all

---

[6] To the extent NFLPI relies on this language for its argument that Panini employees other than Matijevich and Bayne are part of executive management, *see* NFLPI Pre-Hearing Br. at 26, we agree with Panini that indispensability and membership in a corporation's executive management are largely distinct questions.

NFLPI has shown is that as of the date of that email, October 1, 2021—over a year and a half before Matijevich and Bayne left Panini for Fanatics—Aravecchia believed Matijevich and Bayne were indispensable to Panini.  Whether or not Aravecchia was right that Matijevich and Bayne actually were indispensable in October 2021, however, they were not in April 2023, which we know because Panini was able to execute the Rookie Premiere successfully shortly after their resignations.

We conclude that Panini did not experience a material change to its executive management, and therefore NFLPI's exercise of its termination rights under § 31 of the License Agreement was invalid.

### B.  The Sales of the Autographed ▮▮▮ and ▮▮▮ Cards Do Not Justify Termination

NFLPI alternatively argues that its putative termination was justified by Panini's failure, in violation of § 15(B) of the License Agreement, to obtain approval to sell trading cards featuring ▮▮▮ and ▮▮▮ autographs or publish social media posts featuring them.  NFLPI Post-Hearing Br. at 32; NFLPI Post-Hearing Reply Br. at 9.  We find that any breach was immaterial and NFLPI failed to give Panini notice and an opportunity to cure.  For both of these independent reasons, Panini's termination of the License Agreement was not justified by § 15(B).[7]

### 1.  Any Breach Was Not Material and Cannot Justify Termination

"[U]nder New York law, . . . a party is relieved of continued performance under a contract only when the other party's breach is 'material.'"  *In re Lavigne*, 114 F.3d 379, 387 (2d Cir. 1997); *see also Callanan v. Powers*, 199 N.Y. 268, 284 (1910) (rescission "is not permitted for a slight, casual or technical breach, but, as a general rule, only for such as are material and willful, or, if

---

[7] NFLPI also argues that termination was justified by Panini's breach of § 15(F) of the License Agreement, *see, e.g.*, NFLPI Post-Hearing Br. at 32–33, but for the same reasons—immateriality and NFLPI's failure to provide written notice—we disagree.

not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract").  Since we conclude Panini's assumed breach was immaterial, it cannot justify Panini's termination of the entire License Agreement.

"Under New York law . . . [a] breach is material when it substantially defeats the purpose of that contract."  *Nadeau v. Equity Residential Properties Mgmt. Corp.*, 251 F. Supp. 3d 637, 641 (S.D.N.Y. 2017) (quotation marks omitted).  We think it plain that Panini's breach by selling and promoting cards featuring autographs by two players did not defeat the purpose of the entire License Agreement.  Under the License Agreement, Panini reported annual net sales of nearly $███████.  Hr'g Tr. 173:21–174:7 (Warsop).  Yet it is undisputed that returns on the disputed sales only amounted to "[j]ust over $████."  *Id.* at 236:5–9.  This negligible proportion is strong evidence of immateriality.  *See, e.g.*, *Wechsler v. Hunt Health Sys.*, 330 F. Supp. 2d 383, 415 (S.D.N.Y. 2004) (finding a breach immaterial when the wrongful sales "represented only roughly 12%" of total sales).  These sales' unimportance to NFLPI is underlined by ████████████ ██████████████████████████████████████ ████████████████████, Hr'g Tr. 738:10–740:3, and by Scebelo's failure to mention this alleged breach in NFLPI's Notice of Termination.

NFLPI responds that Panini's sale and promotion of the autographed ████ and ████ cards was a material breach because it "damag[ed] NFLPI's relationship with ████████ ██████" NFLPI Post-Hearing Br. at 38.  But we do not agree that qualitative speculation as to personal relationships can overcome the quantitative evidence of immateriality—namely, the minuscule sales of the ████ and ████ cards compared to Panini's overall sales under the License Agreement—especially given the clear evidence that ████████████████ █████████████████████████████████████.  NFLPI's alternative argument,

25

that § 20(C) does not expressly impose a condition precedent of materiality for termination, NFLPI Post-Hearing Reply Br. at 11, contradicts New York law on contract termination and lacks supporting caselaw of its own, *see Waxman Real Estate LLC v. Sacks*, 938 N.Y.S.2d 230, 2011 WL 4031522, at *3 n.1 (Sup. Ct. 2011) (an argument is "abandoned" when its proponent does not "cit[e] to any supporting caselaw").

### 2.    NFLPI Did Not Give Required Notice and an Opportunity to Cure

NFLPI's attempted termination fails for an independent reason: The License Agreement required it to give Panini ███████ notice and an opportunity to cure before NFLPI could terminate. NFLPI's bargained-for right to terminate was not absolute, but carefully circumscribed.  Under the License Agreement, ████████████████████████████████████████████████

██████████" including its obligations under § 15(B), "██████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████."  License Agreement § 20(C).  "[A] party's termination is ineffective where the relevant contract provides for a notice-to-cure and notice is not provided." *E. Empire Constr. Inc. v. Borough Constr. Grp.*, 156 N.Y.S.3d 148, 152 (App. Div. 1st Dep't 2021).

NFLPI does not dispute that it did not provide written notice.  Instead, it argues that the notice and cure provision does not apply here, since the sale and promotion of the autographed ██████ and ██████ trading cards were incurable.  *See* NFLPI Post-Hearing Br. at 37–38; NFLPI Post-Hearing Reply Br. at 11.  While it is true that "New York common law will not require strict compliance with a contractual notice-and-cure provision if providing an opportunity to cure would be useless," *Giuffre Hyundai, Ltd. v. Hyundai Motor Am.*, 756 F.3d 204, 209 (2d Cir. 2014), cure

was not useful in this case.  Warsop testified that the ▮▮▮▮ and ▮▮▮▮ trading cards took days to ship, and Panini could have "credited all the consumer credit cards and just not ship[ped] those [trading] cards" had it received written notice from NFLPI.  Hr'g Tr. 232:11–21.  NFLPI does not dispute Warsop's testimony on this point, so we credit it and conclude that Panini likely could have cured the breach within the ▮▮▮▮ period provided by § 20(C) of the License Agreement.  Therefore, § 20(C) cannot justify NFLPI's attempted termination.[8]

Having found that any such breach is immaterial and that NFLPI did not provide the required notice, we need not decide whether the sales or promotion that are the subject of this dispute constituted a breach.

### C.    We Award Panini Damages for NFLPI's Failure to Approve Card Sets

Because NFLPI's termination of the License Agreement was wrongful, we now address what damages, if any, it owes Panini.  We conclude that the License Agreement does not allow for damages against NFLPI relating to the termination of college licensing agreements.  But we award Panini $7,816,946.97 in damages for NFLPI's failure to approve card sets for approximately 50 days under the mistaken belief that the License Agreement was no longer in effect.

### 1.    Damages from the Terminations of the College Agreements Are Consequential Damages Barred by the License Agreement

Panini seeks damages caused by the termination of its agreements with various colleges in the aftermath of NFLPI's purported termination of the License Agreement.  On August 28, 2023, a week after sending the Notice of Termination to Panini, Scebelo sent a letter to The Collegiate

---

[8] Any immaterial breach by Panini may have given NFLPI a claim for money damages, to which § 20(C), which only governs termination, would not apply.  *See Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015) (a "nonbreaching party is entitled to damages caused even by [an] immaterial breach").  But NFLPI does not request or calculate damages specific to the ▮▮▮▮ and ▮▮▮▮ cards, so we do not reach the issue.

27

Licensing Company ("CLC"), an agency that manages licensing for approximately 250 colleges. *See* Hr'g Tr. 243:20–244:5 (Warsop). In the letter, Scebelo informed CLC that NFLPI had "exercised its contractual right to terminate the Panini License," and "[a]s a result, Panini no longer has rights" to distribute trading cards featuring many NFL players. Panini Ex. 170 at NFLPI_0001558. Soon thereafter, CLC sent a letter to its member colleges informing them that "the NFLPA . . . ha[s] terminated [its] agreement[] with Panini," and recommending the colleges "terminate [their] agreements with good partners" like Panini and accelerate their contracts with Fanatics subsidiary Topps. Panini Ex. 16 at PAN-NFLPI_00027658, PAN-NFLPI_00027660–61. Ninety-four colleges then terminated their agreements with Panini. Hr'g Tr. 250:11–15 (Warsop). Panini now requests damages of approximately $31.4 million from those terminations. *See* Panini Post-Hearing Reply Br. at 25.

The License Agreement bars consequential damages against NFLPI. *See* License Agreement § 24 ("███████████████████████████████████████████ ████████████████████."). Damages that are "the result of a separate agreement with a nonparty" are normally consequential. *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 22 N.Y.3d 799, 808 (2014); *see Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) ("Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements."). Panini admits that its requested damages stem from nonparties' decisions to terminate separate contracts with Panini. *See* Panini Pre-Hearing Br. at 5 ("*90-plus colleges* terminated *their agreements* with Panini." (emphases added)). These damages are plainly consequential.

Panini responds by asking us to disregard § 24. Panini Post-Hearing Br. at 47; Panini Post-Hearing Reply Br. at 19. "[A]n exculpatory clause is unenforceable when . . . the misconduct for

28

which it would grant immunity smacks of intentional wrongdoing." *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385 (1983).  But we find no evidence of intentional wrongdoing in NFLPI's decision to terminate the License Agreement.

In its pleadings and briefing, Panini repeatedly argues that NFLPI acted in bad faith, terminating the License Agreement pretextually in order to favor Panini's direct competitor, Fanatics.  *See, e.g.*, Am. Demand ¶ 48 (NFLPI's reasons for termination "are mere pretext to free NFLPI to contract with the entity ███████████████████ and (on information and belief) ████████: Fanatics"); *id.* ¶ 109 ("NFLPI's pretextual termination of the Agreement to immediately execute a new exclusive-licensing agreement with Fanatics constitutes bad faith."); Panini Post-Hearing Br. at 21 ("NFLPI's attempt to terminate Panini was . . . pretextual, arbitrary, and manipulative conduct."); Panini Post-Hearing Reply Br. at 9 (NFLPI "created an incentive for Fanatics to induce NFLPI to terminate its license with Panini before its natural termination" in exchange for Fanatics "reward[ing] NFLPI for terminating").  But after extensive discovery, a third-party subpoena for documents and testimony, and live testimony from a corporate representative of Fanatics at a preliminary hearing, the evidence does not bear out Panini's allegations of wrongdoing.

It is undisputed that Howell alone made the decision to terminate the License Agreement. Howell Dep. Tr. 181:19–22; Panini Post-Hearing Br. at 23.  He did so after receiving legal advice from counsel regarding NFLPI's rights under § 31 of the License Agreement, Howell Dep. Tr. 181:23–182:15; Hr'g Tr. 674:4–10 (Howell), and after considering a financial model showing the potential for declining future revenues were NFLPI to continue to contract with Panini, *see* Panini Ex. 227; Hr'g Tr. 756:2–757:25 (Howell).  Panini has presented no evidence that anyone at Fanatics had undue influence over Howell's decision.  NFLPI was incorrect that it had the legal

right to terminate the agreement, but Howell's decision to do so was not based on any collusive conduct with Fanatics or bad faith towards Panini.

Scebelo's letter to CLC was entirely downstream of Howell's decision. The letter accurately stated NFLPI's understanding of the legal situation at the time. Section 24 is therefore fully enforceable, and Panini cannot recover damages stemming from terminations of its college license agreements.

### 2. Panini Has Adequately Shown Causation for the Cancellation of Some Card Sets

Panini's other theory of damages arises from NFLPI's refusal to approve Panini trading cards for approximately 50 days, starting on the date of the Notice of Termination, August 21, 2023, Panini Post-Hearing Br. at 35–36; *see* Hr'g Tr. 255:17–256:18 (Warsop), which we have already found to have been wrongful. As a result, Panini says it "had to cancel five collections"— Encased, Playbook, Chronicles, Legacy, and Plates & Patches. Hr'g Tr. 255:19–256:3, 258:18– 262:17 (Warsop). Warsop's testimony is sufficient to show a causal connection between NFLPI's denial of approvals and the cancellations of the Chronicles, Legacy, and Plates & Patches collections. *See id.* at 259:5–260:10, 262:4–263:10. While NFLPI asserts that Fanatics's hiring of Panini's employees, a break-in at Panini's offices, or Fanatics's purchase of GCP may have been responsible for discontinuation of these collections, and correctly notes that Panini bears the burden of proof, *see, e.g.*, NFLPI Post-Hearing Reply Br. at 18–21, we credit Warsop's testimony and conclude that Panini has met its burden with respect to these three sets.

We agree with NFLPI, however, that Panini has not proffered sufficient evidence of causation with respect to the Encased and Playbook collections. Although Warsop testified that Panini cancelled Encased because of the denial of approvals, Hr'g Tr. 341:21–25, he also said that the set "was one particular product that was in the calendar, out of the calendar, in the calendar"

30

and was "cancelled at one stage and then went back in," *id.* at 342:6–14.  NFLPI introduced evidence that, as of July 31, 2023—only a few weeks before NFLPI's Notice of Termination— Panini had removed Encased from the production calendar.  *See* NFLPI Ex. 46 at PAN-NFLPI_00018875 (noting that Panini "removed" Encased "to free up calendar space for products that have moved back, but also because of product performance and production/execution challenges").  Further, Warsop agreed with NFLPI's counsel that "when [Panini] showed NFLPA a list of products planned, when [Panini] did this in August of 2023, Encased still wasn't in there." Hr'g Tr. 343:13–18.  Similarly, NFLPI presents evidence that Panini seriously considered cancelling the Playbook collection in March 2023 due, in part, to Fanatics's acquisition of GCP. *See* NFLPI Ex. 45 at PAN-NFLPI_00002213 ("May need to eliminate Playbook, due to complexity of the build by GC[P].").  NFLPI's specific evidence of alternative causal explanations for Panini's cancellation of the Encased and Playbook collections casts substantial doubt on Warsop's relatively brief testimony on these points.  We conclude that Panini has proven that NFLPI's failure to approve card sets caused the cancellation of the Chronicles, Legacy, and Plates & Patches collections only.

### 3.    We Award Panini Damages of $7,816,946.97

Panini requests approximately $10 million in damages for the cancellation of the Chronicles, Legacy, and Plates & Patches trading card sets.  Panini Post-Hearing Br. at 33.  We note at the outset that New York law counsels us to award Panini damages: "When it is certain that damages have been caused by a breach of contract, and the only uncertainty is to their amount, there can rarely be good reason for refusing on account of such uncertainty any damages whatever for the breach."  *Randall-Smith, Inc. v. 43rd St. Estates Corp.*, 17 N.Y.2d 99, 106 (1966) (citation omitted).  In that situation, damages "need only be proved with reasonable certainty" since "[t]he

wrongdoer must shoulder the burden of the uncertainty regarding the amount of damages." *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995).

Panini's damages expert, Dr. Jeffrey Leitzinger, "use[d] the results that Panini achieved with these same collections in the previous season to estimate the losses associated with their cancellation," using "the contribution margin (CM) generated by those collections as the loss associated with their cancellation." Panini Ex. 224 ¶ 58. He ultimately "used the CMs generated by these same collections in the previous season." *Id.* ¶ 59. Dr. Leitzinger's method, however, is imperfect. Dr. Leitzinger testified that using the previous year's results is "an unbiased predictor," making it "a reasonable way to answer that question," Hr'g Tr. 623:4–16, but other evidence undercuts the reasonableness of this method and the unbiased nature of his predictions. Dr. Leitzinger testified that using the previous year's results to estimate the next year's results is a sound method because "their revenue, whatever it was in 2022/23 is a good projection[] [for] 2023/'24." *Id.* at 626:6–12. But NFLPI's damages expert, Ned Barnes, points out in his rebuttal expert report that the previous year's revenue for a particular card set "is a consistently poor predictor for sales of that collection in the following year." NFLPI Ex. 280 ¶ 12. The more fundamental problem, however, is that a prior year's sales are a poor predictor of the next year's sales in a one-sided way: They "overstate[] sales of the same collection in the following year." *Id.* ¶ 13.

To demonstrate this, Barnes "selected the ten highest selling 2023 collections based on reported sales data," and also included the rest of the sets for which Panini seeks damages (excluding Plates & Patches, which was not released in 2021–22). *Id.* ¶ 14 & n.25. The data clearly show that sales of each set generally decline from year to year, with the sole exception of the Score collection. The revenue for the sets Barnes listed declined by an average of 22% between

32

2021–22 and 2022–23. *See id.* at 9 tbl. 2. We therefore disagree with Dr. Leitzinger's testimony that the past year's sales are an "unbiased" predictor; on the contrary, it is biased in favor of a larger damages award. We therefore reject Panini's damages estimate.

Nevertheless, we also reject NFLPI's argument that Panini should receive only nominal damages. NFLPI Post-Hearing Reply Br. at 25. Although Barnes successfully injected some uncertainty into Dr. Leitzinger's estimate, uncertainty is not enough of a "good reason" to award no damages at all. *Randall-Smith*, 17 N.Y.2d at 106. Instead, we "accept[] [Dr. Leitzinger's] basic methodology but f[i]nd support in the record for adjusting the calculations in order to arrive at a more just award." *Matter of City of New York*, 42 N.Y.2d 948, 949 (1977); *see also Tractebel*, 487 F.3d at 112 ("New York courts have significant flexibility in estimating general damages once the fact of liability is established."). Barnes's report provides a straightforward way to adjust Dr. Leitzinger's estimate to more accurately predict the cancelled sets' likely sales, thereby arriving at a "stable foundation for a reasonable estimate." *Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 383 (1974). Since the sales of highest-selling sets, plus the sets named by Panini, declined by an average of approximately 22%[9] between 2021–22 and 2022–23, a 22% reduction would more accurately estimate the likely sales of the Chronicles, Legacy, and Plates & Patches collections had they not been cancelled due to NFLPI's wrongful conduct. Reducing Panini's proposed damages of approximately $10 million by 22%, we award Panini damages of $7,816,946.97, without interest.[10]

---

[9] This figure was calculated by averaging the year-over-year changes to sales in the 13 sets to which Barnes refers. *See* NFLPI Ex. 280 at 9 tbl. 2.

[10] The previous years' contribution margins for Chronicles, Legacy, and Plates & Patches add up to $10,031,620. *See* Panini Ex. 224 at 17 tbl. 2. We calculate the damages award by multiplying 10,031,620 by $(1-((287 \div 13) \div 100))$ and rounding to the nearest cent.

**V.    Conclusion**

We conclude that Panini did not suffer a material change of its executive management, and that Panini's purportedly wrongful use of the ▇▇▇ and ▇▇▇ autographs did not give NFLPI the right to terminate the License Agreement, particularly without providing notice and an opportunity to cure. Accordingly, we award Panini $7,816,946.97 in damages for NFLPI's failure to approve trading card collections, and we declare, order, and adjudge that the License Agreement remains fully in effect.

This Final Award is in full settlement of all claims and counterclaims submitted in this arbitration. All claims not specifically addressed herein are denied. The administrative fees and expenses of the AAA shall be borne by the parties equally.

Dated: July 30, 2024

_____

Michael B. Mukasey

_____

Jeffrey A. Mishkin

_____

Kenneth R. Feinberg

34